OPINION AND OMNIBUS ORDER AND WRIT OF SUPERINTENDING CONTROL

On January 26, 2011, Petitioners’ Counsel David Jordan filed an application to this court to issue a Writ of Superintending Control in order to disqualify the Special Prosecutor (SP) and Window Rock District Court judges, and dismiss the above cases. The basis for the application is delay in the proceedings, ex parte contact between Respondent Judge Carol Perry and the SP Alan L. Balaran, prosecuto-rial misconduct, and the SP’s unlicensed practice of law. At the time of this application, a motion for Mr. Jordan’s disqualification as counsel to Petitioners was pending in the Window Rock District Court. On January 31, 2011, this Court issued an Alternative Writ staying all proceedings in the district court.
Briefs and responses having now been received from the parties and from the Navajo Nation Attorney General as ami-cus curiae, we have become fully aware that the logistical issues raised before the Court encompass not only the instant cases but all the Discretionary Fund Cases (see infra) filed to the Window Rock District Court between October 20-21, 2010. It is also now apparent to this Court that solutions being pursued by the trial courts will not resolve the logistical issues and actually create severe difficulties for the *29 prosecution and permit large-scale gaming of the justice system by defendants. Substantial delays foreseeable in all these cases present extraordinary circumstances and a risk of irreparable harm. Therefore, as the Court issues its decision on the Petition, we further issue an Omnibus Order and Writ of Superintending Control applicable to all the Discretionary Fund Cases.
I
AUTHORITY
The Supreme Court of the Navajo Nation has the authority to issue “any writs ... [njecessary and proper to the complete exercise of [our] jurisdiction.” 7 N.N.C. § 303(A) (as amended by Navajo Nation Council Resolution No. CO-72-03 (October 24, 2003))%1B. “Writs are extraordle nary remedies issued only when there is no plain, speedy and adequate remedy at law.” Johnson v. Tuba City Dist. Ct., No. SC-CV-12-07, 7 Am. Tribal Law 566, 569 (Nav.Sup.Ct. November 7, 2007). A writ is appropriate when a lower court or tribunal over which we have appellate review “abuses its discretion in such an egregious way that only immediate action by this Court will remedy the damage done to a party.” In the Matter of A.P., 8 Nav. R 671, 678, 6 Am. Tribal Law 660 (Nav.Sup.Ct.2005). Furthermore, this court may use its writ authority when the issues at stake are “of significant impact throughout the Navajo Nation.” Id. In addition, such a writ may be appropriate to ensure public confidence in the Navajo Nation government. “The government of the Navajo Nation belongs to the Navajo people. A government cannot operate effectively unless the citizenry' has confidence in its government.” Tuba City Judicial Dist. v. Sloan, 8 Nav. R. 159, 167, 3 Am. Tribal Law 508 (Nav.Sup.Ct.2001).
II
DISCUSSION
This matter concerns issues arising from the unprecedented filing of 259 criminal charges in the Window Rock District Court in a two-day period from October 20-21, 2010, all alleging that 78 delegates of the 20th and 21st Navajo Nation Council had committed theft, fraud, forgery, abuse of office, tampering with public records and conspiracy concerning millions of dollars of discretionary funds intended for the assistance of indigent members of the Navajo Nation pub-(Discretionary Fund Cases).[1] Of the charged delegates, eleven were re-elected in November, 2010 and now serve as delegates on the 22nd Council.[2] Petitioners are 24 of the charged delegates. These cases which concern millions of dollars of Navajo Nation public funds are of immense public concern, and rightly so. The concern is obvious in that the Navajo people need to know what becomes of their money and whether these re-elected incumbents legitimately may serve on the present Council. We perceive no difference between the due process rights of the defendants and the Navajo people to whom the government treasury belongs.
a. Delays
Mr. Jordan asserts that Petitioners’ cases should be dismissed because a witness list was not provided at arraignment pursuant to Nav. R. Cr. P. Rule 25(a) and *30 information listed under Rule 25(b) and (c) was also not timely provided after arraignment. Additionally, a pre-trial conference was not scheduled within twenty days of Petitioners’ jury demand pursuant to Rule 31(d). He further asserts a violation of Petitioners’ speedy trial rights, as proceedings have not advanced in these three months since charges were filed, during which time taped transcripts show that there were ex parte discussions between Judge Perry and the SP on November 8, 2010 and January 10, 2011 regarding transfer of some cases to the other district courts because Mr. Jordan asserts that these communications are highly prejudicial to Petitioners and amounted to judicial and prosecutorial misconduct requiring disqualification. Additionally, the January 10 discussion was during a motion hearing which Petitioners were provided no notice of and did not attend. Finally, he asks for the SP’s disqualification due to unauthorized practice of law pursuant to 17 N.N.C. § 377.
Firstly, no rule cited by Mr. Jordan requires mandatory dismissal upon violation of discovery and pretrial time requirements. Nav. R. Cr. P. Rule 25(a) gives the trial judge the option of accepting a list of witnesses at a later date. Rule 25(b) and (c) requires only that the information be made available pursuant to what has been described as an “open file rule.” See Navajo Nation v. Bigman, 3 Nav. R. 231 (1982). Finally, we agree with the Attorney General that Mr. Jordan has misread Rule 31(d), and the rule plainly sets no time limit within which a pre-trial conference must be held.
This Court is cognizant that we have previously set a high standard for the due process rights to trial of those accused of crimes. Unlike the bilagaana courts, which only require a showing that evidence is lost, memories are dimming, defense witnesses have disappeared, or that defense is impaired, in order to find that delays in criminal proceedings have violated civil rights under the Due Process Clause of the U.S. Constitution, see, e.g., United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), our courts have further taken into account the “anxiety” caused to a charged individual when trial is unreasonably delayed. See Navajo Nation v. Bedonie et al, 2 Nav. R. 131 (Nav.Ct.App.1979) (identifying three interests the speedy trial right was designed to protect, including incarceration, anxiety, and impairment to defense). Under our Navajo Bill of Rights, criminal defendants have a right to a speedy trial. 1 N.N.C. § 6 (2005). In determining whether the right to a speedy trial has been violated, the Court applies four factors: 1) the length of the delay, 2) the reason for the delay, 3) the defendant’s assertion of the right, and 4) the prejudice to the defendant caused by the delay. Navajo Nation v. McDonald, 7 Nav. R. 1, 11 (Nav.Sup.Ct.1992); Navajo Nation v. Bedonie, 2 Nav. R. 131, 139 (Nav.Ct.App.1979); Seaton v. Greyeyes, No. SC-CV-04-06, 6 Am. Tribal Law 737, 741 (Nav.Sup.Ct. March 28, 2006). The Court interprets these factors in light of Diñé bi beenahaz’áanii. Navajo Nation, v. Badonie, No. SCCR-06-05, 6 Am. Tribal Law 725, 728 (Nav.Sup.Ct. March 7, 2006). They are related factors and the Court must consider them together with the relative circumstances, “engaging in a difficult and sensitive balancing process.” Id. Further, “the right of a speedy trial is necessarily relative,” as “it is consistent with delays and depends upon circumstances and secures rights to a defendant, but does not preclude the rights of public justice.” Id. at 728-29.
It is apparent from the pleadings that the simultaneous filings of numerous cases, *31 the subsequent en masse jury demands in separate jury trials, and the prosecutorial burden placed on a single Special Prosecutor present circumstances that are truly unprecedented in the history of the Navajo Nation Courts. Each of the complaints filed in the Discretionary Fund Cases involve complex, multi-page charges rather than the single page complaints typically received by the district courts. As a result, arraignments have been spaced out over a number of months with arraignments yet to be held for many defendants, including 12 of the Petitioners. Respondent states that the Court discussed the likely delays during the two days during which the complaints were signed. Subsequent to that discussion, defendants in all Discretionary Fund Cases were served by summons and none were taken into custody.
Almost all Petitioners and other defendants in the Discretionary Fund Cases have requested jury trials. We take judicial notice that the annual number of jury trials held in the Navajo Nation courts is miniscule. According to judicial branch statistics maintained by the Administrative Offices of the Courts, only 5 jury trials were held in 2007, all of them in civil cases, the costs of which plaintiffs are required to pre-pay pursuant to 7 N.N.C. § 658(B). Juror fees have ranged from $39 to $7,080 in the 2007 cases. However, in 2006, 2008 and 2009, only one jury trial was held in the entire district court system in Ramah, Chinle, and Ramah again respectively. No jury trials were held in 2010, and there is no allocation for juror fees in present district court operational budgets.
According to the most recent branch annual report, fourteen Navajo Nation district court judges serve in 10 judicial districts and collectively manage a caseload of over 51,000 civil and criminal cases. Respondent states that “there is no way one district court of the Navajo Nation can financially or logistically facilitate the hundreds of trials within a reasonable time-frame.” Window Rock District Court’s Response Brief, at 18. Respondent opines that it may take “decades” to conduct the number of jury trials filed in the Discretionary Fund Cases, Reply Brief Exhibit B, January 10, 2011 Hearing Transcript, p. 8, and the SP agrees that “to do an adjudication (of) 259 cases is placing an almost unreasonable burden on the court and one that this court or any other court in the Navajo Nation has to deal with.” Id. at 2.
As a solution, the Window Rock District Court has begun transferring cases to the defendants’ own communities for adjudication, and the district courts have been receiving such cases. However, we are aware of the SP’s argument that transfer brings on substantial issues, including resolution of issues of first impression shared between co-conspirators in five or six different courts, and different verdicts for co-conspirators tried separately. Additionally, the SP frankly states that he is pursuing settlement because the bulk of the cases will overwhelm his own resources and the district courts were each case to be separately tried by jury.
It is our understanding that when a SP is appointed pursuant to § 2021(E), the Navajo Nation Department of Justice must completely step aside and the SP becomes the sole Navajo Nation prosecutor. Therefore, we have here the spectacle of one man—the SP Mr. Balaran plus one associate—charged with pursuing over 70 individual settlements and jury trials across 10 remote Navajo Nation judicial districts at prohibitive contractual cost to the Navajo Nation. The SP, whose office is on the East Coast, has stated that he is not prepared to spend “decades” pursuing these cases which would require him to remain in the vicinity for a protracted, *32 even indefinite length of time. Reply Brief, Exhibit B, January 10, 2011 Hearing Transcript, p. 10. Very likely, the Navajo Nation wall be unable to fund a protracted pursuit. It is self-evident that no single human being, even with help from a capable associate, can hope to perform adequate prosecutorial work within any speedy trial time frame for these many jury trials.
It is apparent to this Court that the district courts have yet to find a workable solution for this extraordinary situation. It is beyond doubt that the Discretionary Fund Cases constitute extraordinary circumstances, and would be so viewed even in any sophisticated court system with far greater resources than our Navajo Nation courts. As previously noted, the complex and multi-page complaints associated with each charge has given rise to a backlog even of arraignments. Indeed, 12 of the 24 defendants represented by Mr. Jordan have yet to be arraigned, meaning that speedy trial time triggers for discovery and pretrial conferences do not yet apply. Additionally, practically each and every defendant arraigned in the Discretionary Fund Cases has requested separate jury trials, a process which entails costs and resources in treasure and staff not presently available in all our district courts combined.
Petitioners have made no showing that impairment has been caused to their defense by the delays. While this Court is fully aware of and compassionate to their anxiety at the prospect of lengthy proceedings, the Discretionary Fund Cases concern allegedly criminal withdrawal of millions from the public treasury by Navajo Nation leaders, and there must be public accountability. In light of the extraordinary circumstances set forth above, we must balance the anxiety caused to Petitioners and all defendants by delays in the proceedings against the rights of public justice.
As previously stated, mandatory timing requirements in the rules of criminal procedure have not been violated. Additionally, the district courts have inherent authority to control the progress of proceedings. Navajo Policy on Appointment of Counsel and Indigency, Rule 2.13 (approved by the Judicial Conference of the Navajo Nation on August 21, 1992 (Resolution No. 92AUG01) and by the Judiciary Committee of the Navajo Nation Council on October 2, 1992 (Resolution No. JCO-13-92)). This right includes the ability to set the timing for proceedings.
We find that due to the extraordinary circumstances, the delays thus far in the proceedings as balanced against the rights of public justice do not rise to a violation of Petitioners’ rights to a speedy trial. However, due process for both the defendants and the Navajo people require that a workable solution must be found for the immense logistical issues attendant to these cases.
Against the backdrop of the immense logistical and funding challenges that clearly face the Navajo Nation and the en masse jury trial demands in these Discretionary Fund Cases, Mr. Jordan’s speedy trial and civil rights arguments are not well taken. As a decades-long practitioner in our courts, he is well aware of the limitations in staff and funding of the Navajo Nation Courts. The fact that arraignments continue to be rolled out makes apparent the extraordinary strain these cases have placed on the present court system. Yet Mr. Jordan asks the Court to dismiss the monumental issues facing us and carry on if the system is able to work normally or not at all. We will not do so.
*33 b. Ex parte Communications
Petitioners demand the disqualification of Judge Perry and the SP due to ex parte communication. We note that pursuant to Nav. R. Cr. P. Rule 18 Petitioners should have first filed a motion for disqualification of the judge in the trial court. However, we will address Petitioners’ request directly for the sake of economy.
It is uncontested that the taped discussions on November 8, 2010 and January 10, 2011 between Judge Perry and the SP concern transfer of Discretionary Fund Cases generally from the Window Rock District Courts to other judicial districts due to the court’s limited resources. Respondent claims that the trial court was seeking a solution within its discretion in accordance with hash yit’éigo dooleel, which addresses a concerted effort to determine how to proceed logistically given a monumental task. Nav. R. Cr. P. Rule 17(b)-(d) authorizes the trial court to transfer cases to “any court” sua sponte. Respondent further asserts that the subject matter falls squarely within permissible contact pursuant to Canon Ten of the Code of Judicial Conduct, which permits ex parte communication “regarding administrative matters, scheduling, or matters unrelated to the merits of the case.” While Mr. Jordan argues that venue has substantive ramifications, Respondents have explained that defendants who object to the receiving venue have an opportunity to challenge the substantive ramifications of the transfer at the receiving court, and that this procedure negates any due process concerns when the transferring court exercises its Rule 17 sua sponte transfer authority. The opportunity to generally request relief in the course of proceedings is set forth at Nav. R. Cr. P. Rule 5(b). Additionally, the record shows that Mr. Jordan was present at the tail end of the November 8 discussion and subsequently agreed to the transfers.
Mr. Jordan next argues that the discussion on January 10, 2011 crossed the line when the SP surveyed potential issues that would be impacted by transfer. However, the record shows that Judge Perry declined to engage the SP in discussing those issues and, instead, focused on the trial court’s logistical need to transfer.
We note that in the bilagaana courts, a trial judge must recuse himself or herself only when the ex parte communication poses a threat to the judge’s impartiality. See, e.g., State v. Lotter, 255 Neb. 456, 586 N.W.2d 591 (Neb.Sup.Ct.1998). In these cases, the logistics-centered discussions occurred prior to any critical stage in the proceedings, and for one-half of Petitioners occurred even prior to their arraignment. Furthermore, the judge could have performed the transfer sua sponte pursuant to Nav. R. Cr. P. Rule 17 without needing to accept any input from the parties. Therefore, we find neither a threat nor appearance of threat to Respondent’s impartiality in this case. Judge Perry shall not be disqualified.
The record shows that there was a bungling of docket numbers in relation to the January 10 hearing. Judge Perry had called the January 10 hearing after the SP had mistakenly filed an Emergency Motion and Memorandum, of Points and Authorities to Retain Venue and Jurisdiction of all the Special Prosecutor’s Criminal Complaints in Window Rock, Arizona Before the Honorable Judge Carol Perry and Request for Hearing under No. WR-SD-01-09, which is a Window Rock Special Division docket number. A copy of this motion was served on Petitioners by the SP. No separate service was made by the trial court. Judge Perry’s subsequent transfer order was filed under No. WR-CV-09-10, a Window Rock District Court *34 number. There is a likelihood that Mr. Jordan failed to receive notice to the hearing because of the docket number mix-up. Regardless of why notice was not sent, the hearing focused on logistics and no part of the discussion concerned specific venue for Petitioners’ cases. Therefore, we find the docket mix-up and lack of notice was harmless error.
Finally, regarding Petitioners’ allegation of a third ex parte communication made “on a date at time that is not known to Petitioners,” Reply at 6, sometime prior to January 18, 2011, Petitioners have been unable to provide even the date, context and content of the communication, let alone transcript or other supporting affidavit, pleading or other documents for the above referenced dockets. Without clear facts to apply, the Court will make no finding on this allegation. Additionally, Petitioners’ request that the remaining Window Rock judge, Judge T.J. Holgate, be disqualified for walking into an ex parte meeting on case management is denied.
c. Unauthorized Practice of Law
Petitioners claim that 17 N.N.C. § 377, enacted after the Special Prosecutor statute, essentially repealed the earlier statute’s express authority for the SP to practice before any court of the Navajo Nation without a license pursuant to 2 N.N.C. § 2023(B),[3] and furthermore, that the earlier statute violates separation of powers due to the Supreme Court’s exclusive authority in the regulation of the practice of law within the Navajo Nation.[4] The issues turn on the intent of the Council and the purpose of the Special Prosecutor statute.
We recently addressed the unauthorized practice of law statutes[5] in relation to an earlier statutory requirement that the individual filling the Chief Legislative Counsel must carry a state bar license. We found that the unauthorized practice of law statutes added the requirement that the position also carry a Navajo Nation Bar Association (NNBA) license without repealing the former statute, and this is indeed the settled governmental policy. See In the Matter of Frank Seanez, 9 Am. Tribal Law 377 (Nav.Sup.Ct.2011). In so finding, we stated, “Our Navajo Nation laws must be read comprehensively and in combination, not piñón picked for provisions that support a given position. Policies evolve over time and are written by human drafters, and the wording of earlier visions will not reflect the full evolved governmental policy expressed in later provisions, nor will the later provision always repeal the earlier provision.” Id., 9 Am. Tribal Law at 384.
Even though a specific exception was not carved out for 2 N.N.C. § 2023(B) in 17 N.N.C. § 377, it is evident that the Attorney General relied on Section 2023(B) in including the name of Alan L. Balaran, a state-licensed practitioner of national reputation without NNBA license, on the short list for appointment by the Window Rock Special Division. Similarly, the Special Division relied on the provision in appointing Mr. Balaran as SP. Although it may appear that both failed to read our laws *35 comprehensively, we believe these governmental bodies relied on the provision in good faith as settled governmental policy with the purpose of finding the best possible neutral investigator for the good of the Navajo people.
That being said, 17 N.N.C. § 377 and 7 N.N.C. § 606 convey strong policy reasons for the NNBA license requirement. The need for a license or for due association with a Navajo Nation barred individual is calculated to protect clients from sub-par representation by practitioners unfamiliar with our laws and culture. We understand that at some point, Mr. Balaran did, in fact, become associated with Mr. Samuel Gollis, who is a Navajo Nation Bar Association member.
The Navajo Nation has previously sought “special admission” for a Special Prosecutor, and said admission was granted by order of this Court. Order, In re Appointment of Special Prosecutor of Navajo Nation, No. SC-SP-02-09, June 15, 2000. “Special admission” in the state courts does not require association with a local bar member. However, nowhere in our rules is “special admission” provided for. The one-time special admission granted by this Court does not constitute settled practice, and shall not be revived unless pi*ovided for in bar admission rules.
It is clear from the plain wording of the Special Prosecutor statute that the Council intended to provide the Special Prosecutor with maximum independence without undue interference or obstruction from all three government branches with the goal of ferreting out corruption and abuse wherever it may be found. The Council’s intent that the individual be unbiased and of some high stature to pursue high governmental misdeeds is plain, as is its concern that such an individual may not be locally found. Given this intent, we find that 2 N.N.C. § 2023(B) amounts to a most specific de jure admission and authority for the SP to practice and that the provision which was not repealed simply because an express exception was left out in 17 N.N.C. § 377. For this reason also, we find no violation of separation of powers. Petitioners’ assertion of unauthorized practice as a basis for disqualification is, therefore, rejected.
That being said, we find that both 2 N.N.C. § 2023(B) and the unauthorized practice of law statutes can and must coexist and are capable of being read together. The de jure admission by statute of the SP into Navajo Nation legal practice must be accompanied by his association with a licensed Navajo Nation Bar member, which has been done in this case. Additionally, implicit in the Special Prosecutor statute is a requirement that the SP, once duly admitted-by-statute, must serve with honor in the public interest as an officer of the Court and is subject to all disciplinary rules.
Ill
EXTRAORDINARY CIRCUMSTANCES
The “extraordinary circumstances” raised before this Court exist in all pending Discretionary Fund Cases with risk of irreparable harm. Respondent, the Special Prosecutor, and the Attorney General appear in agreement that these extraordinary circumstances necessitate extraordinary solutions. Again, we repeat that due process belongs both to the defendants and the Navajo people. In normal circumstances, the courts are expected to guard against the impairment of the defense; in this instance, the justice system itself is impaired by the flood of cases and the en masse jury demands. It is apparent that no workable solution is yet in place.
*36 The transmitted record shows that conspiracy is a shared charge between multiple defendants in this case. This Court is aware that complex multiple defendant joint trials in which shared charges of conspiracy and also separate charges are tried have never been brought in the Navajo Nation trial courts, at least not in this Court’s memory. In the bila-gaana courts, “there is a clear preference that defendants who are indicted together be tried jointly,” particularly in white collar crime cases where there are multiple defendants.[6] The rules of criminal procedure are to be “construed liberally” in favor of joinder.[7] In the transcript of the January 10 hearing, Judge Perry expressed that co-conspirators in these cases may be “just too large for one court to hear.” Reply, Exhibit B, p. 8. However, In United States v. Kipp, 990 F.Supp. 102 (N.D.N.Y.1998), more than seventy defendants were indicted and tried together. Motions to sever were denied in Kipp following which most of the defendants pleaded guilty.
The prevailing understanding in bila-gaana jurisdictions—as we are just now discovering ourselves—is that if the government must conduct separate proceedings against numerous defendants, there will be chaos. There is overwhelming recognition of the importance of joint trials. As stated by the U.S. Supreme Court:
Joint trials play a vital role in the criminal justice system, accounting for almost one-third of federal criminal trials in the past five years. Many joint trials ... involve a dozen or more co-defendants. Confessions by one or more of the defendants are commonplace ... It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution’s case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant’s benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.
Richardson v. Marsh, 481 U.S. 200, 209-10, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).
We note that Evelyn Acothley, the named petitioner, shares a conspiracy charge with 15 other defendants concern- *37 mg allegedly criminal use of $86,525 in public funds. It is our understanding from the record that some defendants may share conspiracy charges with as many as 56 other defendants. While the numerosity of co-conspirators appears daunting, there is no civil rights reason why there should not be joint trials in recognition of the limited resources of the justice system as well as the need for consistent verdicts, speedy trial, and economy. The needs of defendants to a speedy trial in particular, coupled with the highly unusual circumstance of a governmental prosecution conducted by a single individual and his' associate, render this solution absolutely required.
It is without question an untenable burden on the SP to prosecute over 70 delegates in separate jury trials within reasonable time limits. Pursuant to 2 N.N.C. § 2028(G), the SP “may request, and upon request shall receive assistance from any Branch, Division, Department, Office or Program of the Navajo Nation.” While pursuant to Section 2021(E), a finding by the Attorney General that a “personal, financial, or political conflict of interest” existed in the Navajo Nation would have necessitated the appointment of the SP, perhaps that situation no longer exists and the SP may now be given some prosecuto-rial help. Absent a fresh finding that such conflicts persist, we find that the assistance provided for in Section 2023(G) does not exclude the assistance of attorneys and advocates from the Office of the Attorney General and the Office of the Chief Prosecutor in the prosecution of cases that must be provided upon the SP’s request.
We take judicial notice that by established practice, criminal jury trials are paid for out of the public treasury, and further take notice that resources are already scarce for the routine adjudication of civil and criminal cases not only in Window Rock, but in all ten Navajo Nation Judicial Districts. While we note that juries in criminal trials in bilagaana courts are paid for by the state, the Navajo Nation must apply its own laws according to the unique reality of its own circumstances. We note that 7 N.N.C. § 658(A) entitles jurors to be paid travel and per diem “provided funds therefore are appropriated by the Navajo Nation Council.” Interpreting the provision by utilizing Diñé bi beenahaz’áa-nii as required by 7 N.N.C. § 204(A), we find that individuals who serve as jurors must not be expected to bear the costs of their service under any but the most severe circumstance. Ideenágo applies, which is the expectation that what you provide will be appreciated. Juries hear the evidence and render the decision, sometimes at great personal sacrifice. We therefore find the above entitlement to be firm, and the plain wording of the statute merely prohibits payment by the Navajo Nation when there are no funds. When there are no funds allocated, we read the statute as requiring juror fees to be paid by the defendant(s) making the jury demand subject to poverty constraints. Only when poverty is pled and proven and there are no allocated public funds may the trial court require jurors to volunteer.[8]
Despite the months of public awareness that jury demands have been made, no funds for jury trials in the Discretionary Fund Cases has been appropriated by the 21st Council, most of whom were charged by the Special Prosecutor, nor by current Council. Furthermore, we take judicial *38 notice that all governmental branches are presently operating on financial shortfalls. As we previously stated, there are presently no funds specifically appropriated for juror fees. Because defendants are former and current government officials all of whom who have retained private counsel, we may assume that none of the defendants are paupers.
The logistical issues in these cases have been so apparent to this Court, that we must ask why the present government and the SP have not informed the public in order to be frank with the Navajo people regarding the actual resources and options available for bringing the prosecution of these cases to completion through the requested jury trials.
Finally, the SP statute expressly recognizes that governmental conflicts of interest will require unbiased outside assistance. 2 N.N.C. § 2021(E). Pursuant to Section 2023, this unbiased outsider acting as SP is empowered to pursue corruption criminally and civilly in the Navajo Nation, and specifically in Federal and State civil and administrative jurisdictions. Additionally, the Council has given him or her the express grant of “full power and independent authority to exercise all functions and powers of the Attorney General and the Office of the Prosecutor.” Section 2023(A) and see Navajo Nation v. MacDonald, Jr., 7 Nav. R. 1, 5 (Nav.Sup.Ct.1992).
We note that the Navajo Nation Prosecutors in our various districts are able to work independently with federal authorities in the referral to those authorities of relevant criminal matters; therefore the SP has the same authority to do so with the assistance of the full resources of the Navajo Nation pursuant to Section 2023(G), as circumstances dictate.
Whatever solutions are determined, resources within the Navajo Nation may continue to be insufficient to achieve the goal of substantial justice within our Navajo Nation Court system. If Dine justice cannot be achieved because of lack of resources, justice can be sought by federal authorities. The Special Prosecutor is hereby urged to seriously consider referral to the federal authorities of cases which cannot be duly resolved through plea bargains, settlement, and trial in our courts within a reasonable time, and which meet the elements of federal crimes pursuant to 18 U.S.C. § 661, § 666, and other relevant provisions.
IV
OMNIBUS ORDER AND WRIT OF SUPERINTENDING CONTROL
Evidently, a solution must be determined that will ensure justice is served in the Discretionary Fund Cases for both defendants and the Navajo people in light of the Window Rock District Court stated incapacity to handle the numerous cases and the extraordinary logistical puzzle posed to the prosecutorial and court system. The principles of nahat’á and halee-bee impose a duty on the courts to plan for proper resolutions. This court may use its writ authority when the issues at stake are “of significant impact throughout the Navajo Nation.” In the Matter of A.P., 8 Nav. R 671, 678, 6 Am. Tribal Law 660 (Nav.Sup.Ct.2005). There is no doubt that the Discretionary Fund Cases are of such significant impact.
Pursuant to these authorities and for the reasons set forth above, this Court now issues its Omnibus Order and Writ of Superintending Control applicable to all pending Discretionary Fund Cases.
A. Petitioners’ requests for dismissal and disqualification of Judge Carol Perry, *39 Judge T.J. Holgate, and the Special Prosecutor are DENIED.
B. The Window Rock District Court SHALL immediately enter a ruling on the pending motion for Mr. Jordan’s disqualification as counsel to Petitioners.
C. The District Courts SHALL consolidate and hold joint trials for defendants on all outstanding charges in all Discretionary Fund Cases where any single conspiracy charge is shared. The district courts and the Special Prosecutor SHALL provide a plan for the adjudication of the above joint trials to this Court no later than April 30, 2011, during which time all speedy trial timelines are tolled. The communications between the district courts and Special Prosecutor regarding this plan shall not be considered impermissible ex parte communications.
D. The Window Rock District Court SHALL continue transferring Discretionary Fund Cases pursuant to the above plan.
E. The Court AFFIRMS the inherent right of the trial courts to control and manage the proceedings and ORDERS that, due to the extraordinary circumstances, the district courts may set proceedings on a lengthier timeframe than in normal circumstances and may waive otherwise mandatory timeline rules with findings that such delays are necessary in the interest of substantial justice for the defendants and the Navajo people. The trial courts’ scheduling shall not be disturbed absent a showing of an abuse of discretion and substantial impairment on defense.
F. The District Courts SHALL require that defendants in all Discretionary Fund Cases prepay the costs of jury trials in the amount of $2,500 per defendant per separate jury trial and up to $15,000 per joint jury trial to be shared among the co-defendants, with any balance remaining reimbursable to the defendants unless the remaining amount is required to pay the judgment. If defendants fail to make these prepayments according to deadlines set by the courts, and furthermore do not plead and prove indigency, jury trials shall be deemed waived and bench trials shall proceed. Indigent defendants SHALL be entitled to jury trials without pre-payment.
G. The Court further LIFTS the stay in the Window Rock District Court for proceedings consistent with this opinion.
H. The Special Prosecutor SHALL request the assistance of attorneys and advocates from the Office of the Attorney General and the Office of the Chief Prosecutor in the prosecution of the Discretionary Fund Cases. Absent a finding pursuant to 2 N.N.C. § 2021(D) by the Attorney General that any “personal, financial, or political conflict of interest” that initially gave rise to the need for investigation by a Special Prosecutor persists and would impair the prosecutorial performance of such advocates and attorneys, such assistance SHALL be provided in this case upon the SP’s request.

ORDER AMENDING OPINION

The Judicial Branch having been able to cull limited funds from other branch programs and allocate said funds for juror fees, the opinion in the above case, filed March 1, 2011, is HEREBY amended as follows:
The first sentence in Section 1V(F) is stricken and replaced with the following;
“The District Courts shall inform defendants requesting jury trials that juror fees will be fully paid by the courts until funds available for such fees are depleted, where upon defendants SHALL be required to pay jury costs estimated on how long the trial may last. In no event shall the defendants be required to pay more than $2,500 *40 per separate jury trial, and $15,000 per joint jury trial to be shared among the co-defendants. Any balance remaining shall be reimbursable to the defendants unless the remaining amount is required to pay the judgment.”

. The amounts alleged to have been received by each delegate range from $650 to $279,175.

. A further five incumbents who were not charged were also re-elected—Lorenzo Bates, Leonard Tsosie, Katherine Benally, Johnny Naize, and Jonathan Nez.

. which provides: ‘‘A Special Prosecutor shall have full power and authority to appear before any court of the Navajo Nation, the same as if he/she were admitted to the bar of such court, with respect to any matter within his or her jurisdiction or the duties and responsibilities of his or her office.”

. See Eriacho v. Ramah Dist. Ct., 8 Nav. R. 598, 5 Am. Tribal Law 469 (Nav.Sup.Ct.2004); Navajo Nation v. MacDonald, 6 Nav. R. 222 (Nav.Sup.Ct.1990); Boos v. Yazzie, 6 Nav. R. 211 (Nav.Sup.Ct.1990); In re Practice of Law by Avalos, 6 Nav. R. 191 (Nav.Sup.Ct.1990).

. 17 N.N.C. § 377 and 7 N.N.C. § 606

. United States v. Jackson, 180 F.3d 55, 75 (2d Cir.1999); see also United States v. Frazier, 280 F.3d 835, 844 (8th Cir.)(stating that it is rare for a court to "sever the trial of alleged coconspirators”), cert, denied sub nom. Robinson v. United States, 535 U.S. 1107, 122 S.Ct. 2317, 152 L.Ed.2d 1070, cert. denied sub nom. Thomas v. United States, 536 U.S. 931, 122 S.Ct. 2606, 153 L.Ed.2d 793, cert. denied, 537 U.S. 911, 123 S.Ct. 255, 154 L.Ed.2d 191 (2002); Phillips v. Commonwealth, 17 S.W.3d 870, 877 (Ky.2000); State v. Turner, 153 Or.App. 66, 956 P,2d 215, 217 (1998) ("Jointly charged defendants shall be tried jointly unless the court concludes before trial that it is clearly inappropriate to do so... . ”).

. United States v. Sarkisian, 197 F.3d 966, 975 (9th Cir.1999). See generally United States v. Novaton, 211 F.3d 968, 988-89 (11th Cir.2001) ("Nevertheless, because of the well-settled principle that it is preferred that persons who are charged together should also be tried together . .. the denial of a motion for severance. will be reversed only for an abuse of discretion.”), cert. denied 535 U.S. 1120, 122 S.Ct. 2345, 153 L.Ed.2d 173 (2002).

. We note that 7 N.N.C. § 658(B) permits the Court to require that defendants asking for jury trials in civil matters pre-pay juror fees unless they are proceeding in forma pauperis. We further note that since August, 2009, the Navajo Nation court system has set juror fees at $7.25 per hour and reimburses mileage at 55 cents per mile.